# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
YOB, KRAUSS, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private First Class ROBERT W. MEDEIROS**
**United States Army, Appellant**

ARMY 20081092

Headquarters, National Training Center and Fort Irwin
Michael J. Hargis, Military Judge
Lieutenant Colonel F. Dean Raab, Staff Judge Advocate (pretrial and recommendation)
Major Robert A. Vedra, Acting Staff Judge Advocate (addendum)
Major Scott A. Dirocco, Acting Staff Judge Advocate (new recommendation and addendum I)
Lieutenant Colonel Gail A. Curley, Staff Judge Advocate (new recommendation and addendum II)

For Appellant: Colonel Patricia A. Ham, JA; Lieutenant Colonel Imogene M. Jamison, JA; Major Jacob D. Bashore, JA; Captain Kristin McGrory, JA (on brief).

For Appellee: Lieutenant Colonel Amber J. Roach, JA; Major Robert A. Rodrigues, JA (on brief).

17 January 2013

---------------------------------------------------------------
MEMORANDUM OPINION ON FURTHER REVIEW
---------------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

Per Curiam:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of assault consummated by battery (two specifications), adultery, and communicating a threat, in violation of Articles 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 928, 934 (2006) [hereinafter UCMJ]. At the same court-martial, the military judge convicted appellant, contrary to his pleas, of attempted kidnapping, maiming, forcible sodomy, assault consummated by battery (five specifications), and aggravated assault, in violation of Articles 80, 124, 125,

and 128, UCMJ.  The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for thirty-two years, and reduction to the grade of E-1.

On 7 June 2011, this court set aside the convening authority's initial action and returned the record of trial to The Judge Advocate General for remand to the same or a different convening authority for a new staff judge advocate's recommendation (SJAR) and action.  *United States v. Medeiros*, ARMY 20081092, 2011 WL 2377848 (Army Ct. Crim. App. 7 June 2011) (summ. disp.).

Following the new SJAR and action, this court affirmed the findings of guilty and the sentence.  *United States v. Medeiros*, ARMY 20081092, 2012 WL 203419 (Army Ct. Crim. App. 20 Jan. 2012) (summ. disp.).  However, our superior court "conclude[d] that [a]ppellant was denied his Sixth Amendment right to conflict-free counsel in his post-trial representation."  *United States v. Medeiros*, 71 M.J. 316 (C.A.A.F. 2012) (summ. disp.).  Our superior court then reversed our decision and set aside the convening authority's second action.  *Id.*  The record of trial was returned to The Judge Advocate General of the Army for submission to an appropriate convening authority for a new SJAR and action.  *Id.*

This third action has been completed and the record is now before us for further review under Article 66, UCMJ.  Appellant now raises a single assignment of error and alleges, for the first time on appeal, that he received ineffective assistance of counsel during the pretrial phase of his court-martial.  However, we find that the record as a whole compellingly demonstrates the improbability of the facts contained in appellant's affidavit.  As such, appellant's claim lacks merit and we will affirm the findings and sentence in our decretal paragraph.

**BACKGROUND**

*A.  Appellant's Affidavit*

Appellant submitted an affidavit in support of his claim that he received ineffective assistance of counsel during the pretrial stage of his court-martial.  In this affidavit, appellant admitted that his civilian defense counsel informed him that "the government would support an offer to plead guilty in exchange for a maximum of fifteen years confinement."  Appellant was "very interested" in this potential offer to plead guilty because an Army Criminal Investigative Command (CID) agent had previously told appellant he "would be facing a minimum of thirty years confinement for [his] offenses."

Nevertheless, appellant claims that his "civilian defense counsel told [him] that [he] would be 'stupid' to plead guilty because there was no doubt we would win the case."  Appellant further swore that his civilian defense counsel "even said this

2

would be a 'slam dunk' case and he couldn't lose." Appellant also stated his civilian defense counsel informed him that he "would not be found guilty and that [he] would not serve any confinement."

Ultimately, appellant rejected the offer to plead guilty and claimed that "[t]he only reason [he] did not submit the offer to plead guilty is because [his] civilian defense counsel told [him] that [he] would not lose and that [he] would not go to jail." Appellant concludes in his affidavit that had his civilian defense counsel properly advised him about the offer to plead guilty and recommended to accept the offer, appellant would have done so because his "primary goal going into [his] court-martial was to avoid a lengthy jail sentence."

*B. Appellant's Guilty Plea Inquiry*

At his court-martial, appellant pleaded guilty without the benefit of a pretrial agreement to Specifications 1 and 6 of Charge V (assault consummated by battery) and Specifications 1 (adultery) and 3 (communicating a threat) of Charge VI. The military judge accepted appellant's guilty pleas to these offenses after conducting a providence inquiry. Appellant also initially pleaded guilty to Charge III and its Specification (maiming) and to Specifications 5 and 8 of Charge V (assaults consummated by battery).

During the providence inquiry into the maiming offense, the following exchange took place among the parties:

> MJ: Okay. What injuries were you intending to inflict?
>
> [Accused conferring with defense counsel.]
>
> Acc: I just wanted to hurt her, I just wanted to do what Brian said. I just wanted to beat her up a little bit, just make it so Brian wouldn't do anything to us. So, that's all.
>
> . . .
>
> MJ: Defense, . . . [d]o you believe that a defense of lack of mental responsibility exists in this case?
>
> DC: I wish that it did, Your Honor. It does not!
>
> MJ: Even though your client is telling me that at the time he was hearing voices from a person who he believed to be real, who he now believes to be imaginary?

DC:  There are multiple renditions over time, Your Honor.

MJ:  Well, I'm most concerned with the rendition I get here today.

DC:  I understand that, and this is not the anticipated rendition, but I can tell you, Your Honor, as an officer of the court, this has been explored in many, many ways.

Later on during the providence inquiry into the maiming offense, the following exchange took place between the military judge and appellant:

MJ:  Did you have any lawful justification or excuse for engaging in those actions of throwing [LC] to the ground and kicking her?

Acc:  Well, just—just Brian.  I figured that if I didn't do it then Brian would go after our families, and would—would kill them.

MJ:  Okay, so there is a possibility that you might have had a legal justification or excuse.  We are going to talk about the defense of duress in just a moment.

After the military judge explained the defense of duress to appellant, the following exchange took place among the parties:

MJ:  . . . Now you told me that you thought that Brian would come and do something worse to you, is that correct?

Acc:  He would—he would—I knew for a fact that he would kill my grandma, and he would go after [LC's] family.

MJ:  Did you believe at that point that he was going to do that immediately?

Acc:  Yes.  He said he had someone—he had someone parked outside my grandma's house, sitting outside in front of her house in a car.

> MJ:  So you thought that if you didn't do it, you didn't do it right then—
>
> Acc:  That if I didn't take care of [LC,] then—then—then she would—then people would die.
>
> MJ:  Immediately?
>
> Acc:  Yeah, yes, sir.
>
> MJ:  Who did you think would die immediately?
>
> Acc:  My grandma, uh, [LC's] family, uh—we—we—I didn't know if [LC's] family would die, I just knew that they would get hurt.  Her mom got threatened, and—and that's it.
>
> MJ:  Counsel, I have some serious reservations.
>
> DC:  Only equaled to by mine.
>
> MJ:  I have no doubt.
>
> DC:  I don't even know what to say to you except I need a recess.
>
> . . .
>
> MJ:  Okay.  The court is in recess.

After the recess, appellant withdrew his guilty plea to Charge III and its Specification.  A similar issue arose during the providence inquiry into Specification 8 of Charge V (assault consummated by battery).  Appellant admitted to placing LC's hand over a lit gas stove top and burning it.  However, this was again done at the behest of "Brian," as it occurred right before appellant maimed LC:

> MJ:  So you got a message from Brian and then you held her hand over the stove?
>
> Acc:  Yeah, I—I—I hit her in the face, first with my open hand, then I grabbed her by her arm, brought her into the kitchen, uh-mmm, turned on the stove, told her 'this is—this is what Brian said he would do to you if you don't listen'—'if we don't listen,' and I held her hand over it,

and then when I saw that the flame touched it, I pulled her hand back. And then I brought her back out into the living room area, and I threw her on the floor, and that is when I—when the maiming happened.

MJ: What specifically did Brian tell you to do on the 5th of February 2008?

Acc: Take care of her.

MJ: Alright.

Acc: He was afraid that—that she was going to go home, because she was—she was talking about going home. He was afraid she was going to go home, and—and afraid that I had told her about, uh-mmm, all the different things, and stuff like that.

MJ: And you told me that you did that because Brian told you that there was someone parked outside of your grandmother's house—

Acc: Yes, sir.

MJ: And if you didn't do what Brian told you to do, someone was going to kill your grandmother?

Acc: Someone was going to kill my grandma and—

MJ: Right then?

Acc: And they were going to—going to hurt her family.

MJ: Right then?

Acc: Yes.

. . .

MJ: Counsel, we have the same problem with Specification 8 as we do with the maiming charge.

DC: I couldn't agree with you more, we will withdraw the guilty plea.

Likewise, the military judge also rejected appellant's guilty plea to Specification 5 of Charge V (assault consummated by battery). During the providence inquiry, appellant stated that he took Ambien on 2 January 2008 and "tripped out." After taking Ambien, appellant became violent and shocked LC with a taser. Appellant did not remember shocking LC, but LC and appellant's wife informed him the next day that he used a taser against LC, appellant's wife, and himself. After appellant guessed that he was not in control of himself at the time he shocked LC, the military judge found him improvident to Specification 5 of Charge V.

*C. Civilian Defense Counsel's Findings Argument*

After a trial on the merits of the remaining charges and specifications, appellant's civilian defense counsel only focused on certain offenses during his findings argument: "I will simply say that with respect to the following charges and specifications, the elements have not been met." First, civilian defense counsel argued that appellant did not attempt to kidnap LC because there was a lack of evidence as to appellant's specific intent to kidnap.

Second, civilian defense counsel argued that appellant was not guilty of Specification 2 of Charge VI (kidnapping) on a separate occasion at Fort Irwin because LC "had every opportunity to extricate herself from the situation, if she so chose, she chose not to." Civilian defense counsel pointed out that LC talked to her father during the applicable time period and that there was no evidence appellant advised LC to lie to her father and say that she was in San Diego. Thus, civilian defense counsel argued "[t]here was no carrying away, there was no inveigling, there was no moral suasion to move her to a place that she didn't want to be in."[1]

Third, civilian defense counsel argued that appellant did not commit aggravated assault (Specification 4 of Charge V) because "the elements of grievous bodily harm are simply not met." Stated differently, "the injuries sustained would not comport with an aggravated assault because there is no cutting, there are no broken bones, nothing to suggest aggravation[,] the use of hands and feet, even though the foot was shod with a sneaker, does not elevate itself to a means likely." Thus, civilian defense counsel concluded that Specification 4 of Charge V "is a simple assault, just like all the other simple assaults."

Finally, civilian defense counsel argued that appellant should be acquitted of the two aggravated sexual assault offenses and the forcible sodomy offense because LC "established a pattern in practice with [appellant] of saying no but then

---

[1] The military judge found appellant not guilty of Specification 2 of Charge VI.

yielding." Thus, the defense of mistake-of-fact applied because LC's declination did not actually mean declination given the pattern of practice between LC and appellant.[2] Appellant's civilian defense counsel did not address any of the other remaining charges or specifications during his findings argument.

### D. Appellant's First Clemency Submission

Defense Appellate Exhibit A consists of a handwritten, twelve-page personal letter appellant drafted and submitted to his trial defense counsel for purposes of his original submission to the convening authority pursuant to Rule for Courts-Martial [hereinafter R.C.M.] 1105. Appellant faxed this letter to his trial defense counsel on 8 June 2009.

At the beginning of appellant's clemency letter, he states "[t]hrough the duration of this letter I will show you that at my trial I was making decisions not based on logic but on emotions; that are and were clouded by my various mental illnesses." On page two of appellant's letter, he states the following:

> The first thing I should go over is one of the biggest things. Right before my trial I was offered a deal of 15 years. I denied that deal on the sole basis that if I got 15 or 30 years it did not matter I was going to kill myself either way. I said this solely because I was unmedicated before and at my trial. Part of my condition was known but was not being treated properly, if at all. Which in turn caused me to make a 32 year decision that is the worst decision of my life. . . .

### LAW AND DISCUSSION

"Article 66(c) does not authorize a Court of Criminal Appeals to decide disputed questions of fact pertaining to a post-trial claim, solely or in part on the basis of conflicting affidavits submitted by the parties." *United States v. Ginn*, 47 M.J. 236, 243 (C.A.A.F. 1997). Nonetheless, a soldier is "not . . . always entitled to

---

[2] The military judge found appellant not guilty of both of the specifications alleging aggravated sexual assault. The military judge did express concerns with the government over how it charged the aggravated sexual assault offenses immediately after the parties' concluded findings argument. Specifically, the military judge questioned the government as to why it charged this case as an aggravated sexual assault offense against someone who was substantially incapable of declining participation versus an aggravated sexual assault offense involving the use of threats or placing another person in fear of death or serious bodily harm.

a factfinding hearing on his collateral claim." *Id.* In fact, a post-trial evidentiary hearing need not occur if the following principle applies:

> Fourth, if the affidavit is factually adequate on its face but the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of those facts, the Court may discount those factual assertions and decide the legal issue. . . .

*Id.* at 248.

We find that this fourth *Ginn* principle applies in appellant's case; therefore, an evidentiary hearing on appellant's claim of ineffective assistance of counsel need not occur. In fact, we find the appellate filings and the record as a whole establish the absurdity of the claims made in appellant's affidavit and that the claims made in appellant's affidavit utterly lack any credibility. Instead, the representation contained in the record of trial establishes civilian defense counsel's effort to properly and ably represent appellant in a professional manner throughout his court-martial.

Appellant first makes the following claim in his affidavit:

> After telling me about the possibility of a deal, my civilian defense counsel told me that I would be 'stupid' to plead guilty because there was no doubt we would win the case. [H]e even said this would be a 'slam dunk' case and he couldn't lose. He told me I would not be found guilty and that I would not serve any confinement.

However, this particular claim is wholly inconsistent with the record of trial, as appellant initially pleaded guilty without the benefit of a pretrial agreement to one specification of maiming, four specifications of assault consummated by battery, one specification of adultery, and one specification of communicating a threat. The military judge accepted appellant's guilty pleas to two specifications of assault consummated by battery, one specification of adultery, and one specification of communicating a threat. If the military judge would have further accepted appellant's pleas to maiming and two specifications of assault consummated by battery, appellant would have faced a maximum punishment of a dishonorable discharge, confinement for twenty-six years, total forfeiture of all pay and allowances, and reduction to the grade of E-1 based solely upon his initial guilty plea. Thus, it strains credulity to believe that civilian defense counsel informed appellant he had a "slam dunk" case that would not result in any conviction or sentence to confinement, when appellant initially attempted to plead guilty to seven different offenses.

9

Second, appellant states the following in his affidavit:

> Based solely on the advice of my civilian counsel, I decided not to submit an offer to plead guilty in exchange for the sentence cap. . . . The only reason I did not submit the offer to plead guilty is because my civilian defense counsel told me that I would not lose and that I would not go to jail. Had my civilian defense counsel properly advised me, and informed me of the lack of defense available to contradict the overwhelming evidence, I would have pled guilty to the charged offenses in exchange for a fifteen year cap on my sentence.

Again, appellant's claims are altogether inconsistent with the record of trial and the appellate filings. In addition to appellant's initial guilty plea to seven offenses, civilian defense counsel's findings argument demonstrates a logical assessment of appellant's case. Civilian defense counsel only argued that appellant was not guilty of the sex offenses (Charge II and its Specification, Charge IV and its Specification, and Additional Charge II and its Specification), the attempted kidnapping offense (Additional Charge I and its Specification), and the kidnapping offense (Specification 2 of Charge VI).

On the other hand, civilian defense counsel made no attempt to argue that appellant should be acquitted of the maiming offense (Charge III and its Specification) or five of the assaults consummated by battery (Specifications 2, 3, 5, 7, and 8 of Charge V). In addition, civilian defense counsel argued that appellant should be found guilty of an assault consummated by battery versus aggravated assault (Specification 4 of Charge V). Thus, civilian defense counsel's findings argument is incompatible with the position that appellant would not "lose" or go to jail.

Moreover, appellant's affidavit is strikingly inconsistent with the personal letter that appellant drafted as part of his initial clemency packet under R.C.M. 1105. Appellant unambiguously stated in his first clemency letter that he denied the potential pretrial agreement "on the *sole* basis that if I got 15 or 30 years it did not matter I was going to kill myself either way." (emphasis added). This statement demonstrates the falseness associated with appellant's current claim that "[t]he only reason I did not submit the offer to plead guilty is because my civilian defense counsel told me that I would not lose and that I would not go to jail."

Third, appellant swore to the following in his affidavit:

> The theory of the case, as told to me by my civilian
> defense counsel, was going to be that my friend [JC]
> committed the offenses and that he was 'Brian.'

The record likewise contradicts appellant's claim. During the providence inquiry into appellant's failed attempt to plead guilty to the maiming offense, appellant brought up "Brian." After the military judge expressed reservations with appellant's "rendition," civilian defense counsel stated that the "rendition" involving "Brian" was "not the anticipated rendition." Later, when contemplating a continuance before trial on the remaining charges and specifications, civilian defense counsel stated that matters were raised during the providence inquiry on issues that the defense team thought were already "dealt with completely." Clearly, the entire providence inquiry negates the notion that the defense theory of the case was going to center around making appellant's friend, JC, the perpetrator because he was "Brian." Instead, the providence inquiry reveals civilian defense counsel's best attempts to assist appellant and to remove "Brian" as justification for appellant's criminal conduct.

Finally, appellant made the following claim in his affidavit:

> My civilian defense counsel never told me the defense
> theory was going to be consent and I was unaware of this
> theory until my trial actually began. I did not believe this
> was a good theory at all for my case.

Yet again, the record of trial entirely contradicts appellant's claim. Civilian defense counsel did not argue that LC consented to appellant's conduct during his findings argument. Instead, civilian defense counsel argued how certain elements of certain offenses were not met. This also included appellant's mistake-of-fact as to consent with respect to the sex offenses based upon the pattern of sexual behavior between appellant and LC. At no time during the findings argument did civilian defense counsel argue that LC consented to the maiming or assault offenses. Instead, civilian defense counsel essentially conceded appellant's guilt to those offenses.[3]

In sum, while appellant's affidavit raises facts involving ineffective assistance of counsel during the pretrial stage of his court-martial, the record as a whole conclusively refutes those facts and demonstrates that appellant's claims are

---

[3] We note that civilian defense counsel's strategy with respect to the findings argument ultimately resulted in appellant being found not guilty of both specifications involving aggravated sexual assault and of the specification involving kidnapping. Further, appellant does not allege that he received ineffective assistance of counsel at trial by civilian defense counsel's concession of guilt to the maiming and assault specifications.

"inherently incredible." *Ginn*, 47 M.J. at 244 (quoting *United States v. McGill*, 11 F.3d 223, 226 (1st Cir. 1993)). Thus, this court discounts appellant's factual assertions and concludes that appellant did not receive ineffective assistance of counsel during the pretrial portion of his court-martial. *See Ginn*, 47 M.J. at 248.

## CONCLUSION

On consideration of the entire record, we hold the findings of guilty and the sentence as approved by the convening authority correct in law and fact. Accordingly, the findings of guilty and the sentence are AFFIRMED.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court